**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | | |
|---|---|---|
| **ERIC J. SHERMAN,** | : | **CASE NO. 3:11-CV-1722** |
| | : | |
| **Plaintiff,** | : | **JUDGE JAMES G. CARR** |
| | : | |
| **vs.** | : | **MAGISTRATE JUDGE** |
| | : | **VERNELIS K. ARMSTRONG** |
| **MICHAEL J. ASTRUE,** | : | |
| | : | **MAGISTRATE'S REPORT AND** |
| **Defendant.** | : | **RECOMMENDATION** |

Plaintiff seeks judicial review, pursuant to Title II (Social Security), § 205(g) of the

Social Security Act, otherwise known as 42 U.S.C. § 405(g) of the Commissioner's final

determination denying his claim for Period of Disability and Disability Insurance Benefits (D(B)

under Title II of the Social Security Act, 42 U.S.C. §§ 416(i) and 423(d).  On August 17, 2011,

this case was referred to the undersigned pursuant to Local Rule 72.2 (automatic reference, non-

document).  Pending are the parties' briefs on the merits (Docket Nos. 16 and 17).  For the

reasons that follow, the Magistrate recommends that the Court Affirm the Commissioner's

decision.

**I.  Procedural Background**

1

On September 10, 2007, Plaintiff, Eric Sherman, filed an application for disability insurance benefits (DIB) under Title II of the Social Security Act, 42 U.S.C. § 416(i); 423(d) (Tr. 161-164).[1]  He alleged disability beginning August 6, 2003, due to lower back problems. (Tr.217). Plaintiff's's application was denied initially and upon reconsideration. He then requested a hearing before an Administrative Law Judge ("ALJ") (Tr. 98).

On May 20, 2010, a hearing was held before ALJ John L. Shailer in Lima, Ohio. Plaintiff, represented by attorney Gregory Kordic, appeared and testified  (Tr. 41-75).[2] Additionally Dr. Paul Gatens, M.D., medical expert, and Richard Astrike, Ph.D., vocational expert appeared and testified at the hearing (Tr. 41-75).  On October 27, 2010, a supplemental hearing was held, with Plaintiff, represented by counsel, appearing and testifying (Tr. 23-40). Additionally, a different vocational expert, Carl Hartung, appeared and testified at the supplemental hearing (Tr. 23-40). On January 3, 2011, the ALJ issued a Notice of Decision-Unfavorable, finding that Plaintiff's back problems did not prevent him from performing a restricted range of simple, sedentary work and that there were a significant number of jobs in the national economy for Plaintiff; thus, he was not disabled (Tr. 6-22).

In a notice dated July 29, 2011, the Appeals Council declined to review the decision of the ALJ (Tr. 1-5).  The ALJ's decision of January 3, 2011, thereby, became the final decision of

---

[1]  All references to the transcript in this Report and Recommendation (i.e., Tr. #) refer to Docket No. 12, with the "Tr." numbers in this Report referring to the numbers located at the lower right corner of the transcript pages.

[2]  At the initial hearing Plaintiff amended his alleged onset date to July 1, 2005 (Tr. 182, Exhibit 7D)  Note that in the Jurisdictional and Procedural History section of his January 3, 2011 Decision, the ALJ erroneously identifies the amended alleged onset date as "July 1, 2010 (Tr. 9).  The document date of the notice of Amended Alleged Onset Date was May 20, 2010 (Tr. 182).

2

the Commissioner.  Plaintiff Sherman brought this appeal before the this Court, seeking judicial review pursuant to 42 U.S.C. § 405(g), to determine whether the Commissioner's decision is supported by substantial evidence.

## II.  Jurisdiction

This Court exercises jurisdiction over the final decision of the Commissioner pursuant to 42 U.S.C. § 405(g).  McClanahan v. Commissioner of Social Security, 474 F.3d 830, 832 -833 (6th Cir. 2006).

## III.  Factual Background

### A.  Plaintiff's History

Plaintiff was born in 1975 and was 27 years old at the time he alleged he became disabled (Tr. 161).  As of the hearing held on May 20, 2010, Plaintiff was 34 years old. (Tr. 44). Plaintiff completed school through the seventh grade (Tr. 44).  Plaintiff's work history included jobs as a bartender, construction worker, laborer for a concrete company, roofer, painter, housekeeper and machine operator at a plastics factory (Tr. 43-49).

### B.  Relevant Medical Evidence and Opinion

#### Northwest Ohio Neurology

On February 18, 2005, Plaintiff underwent a nerve conduction study at  Northwest Ohio Neurology as a result of a complaint of  lower back pain apparently as a result of an August 3, 2003 fall.  He also experienced  numbness and tingling in his back, which radiated down to the bottom of his foot. (Tr. 542). The left lower extremity study was consistent with left S1 radiculopathy. (Tr.547).  On July 29, 2005, subsequent to undergoing conservative treatment, Plaintiff underwent anterior lumbar interbody fusion at L5-S1, placement of Danek Peek cage

3

and placement of small infusion. (Tr. 498).

### Dr. James M. Anthony, M.D. - Examining Physician

Several months after the surgery, on December 15, 2005, Plaintiff saw Dr. James M. Anthony, M.D. for a recheck of his lumbar disk displacement and lumbar radiculopathy. Examination showed tenderness in the lumbosacral spine and decreased range of motion.  It was also observed that Plaintiff continued to be in recovery phase of his fusion surgery (Tr. 280). Dr. Anthony recommended that Mr. Sherman remain off work at that time. (Id)

### Dr. Stephanie A. Matuszak, M.D. - Treating Physician

On August 20, 2003, Dr. Matuszak, noted that Plaintiff reported that he was unable to keep up with his job due to increasing painful spasms. He had been working twenty-one hours a week and was let go (Tr. 356).  An examination by Dr. Matuszak revealed tenderness, spasm and moderate restriction of range of motion. (Tr. 355-356). Dr. Matuszak reported that Plaintiff was released to work with restrictions.  Dr. Matuszak opined that Plaintiff could not lift or carry anything over five pounds; he must be allowed to change positions if needed; and, would be limited to twenty-one hours per week. (Tr. 356).

On February 2, 2006, Dr. Matuszak saw Plaintiff, who presented with complaints of constant radiating numbness down the back of his left leg with burning pain in the bottom of his back. (Tr. 387).  Examination revealed  tenderness over the lumbar spine with a burning, tingling paresthesias over the lower sacrum. Palpitation of the sciatic notch increased radiating numbness down the left leg.  Plaintiff exhibited substantially reduced range of motion in his lower back. (Id).  Dr. Matuszak's impression was that Plaintiff's pain was caused by lumbar disc displacement and lumbar radiculopathy. (Tr. 388).

On March 31, 2006, Dr. Matuszak noted that she was concerned that Plaintiff had post surgical fibrosis and scarring or arachnoiditis.  For this reason, Dr.Matuszak requested an MRI (Tr. 380).  Examination revealed tenderness and spasm in the lumbar spine, reduced range of motion and positive straight leg extension. Dr. Matuszak noted that Plaintiff walked with a stiff gait and a slight limp. (Id).

On April 27, 2006, Dr. Matuszak stated that Plaintiff walked with a cane due to radiating pain down the left leg. (Tr. 383).  Dr. Matuszak's opined that Plaintiff suffered from failed back syndrome. (Tr. 384). The next day, on April 28, 2006, Mr. Sherman underwent an MRI of his lumbar spine. The MRI revealed post-surgical changes to the intervertebral disc at  L5-S1, with some signal fluid artifact. There was also a mild degree of diffuse bulging disk at L3-L4 and L4-L5. (Tr. 361).

On May 25, 2006, Dr. Matuszak again saw Plaintiff.  Dr. Matuszak noted that Mr. Sherman had been found to have epidural fibrosis and scarring. (Tr. 378).  Plaintiff and Dr. Matuszak discussed whether it was possible for Plaintiff to get a job as a bartender, where the work required twelve hours a week, lifting no more than five pounds and the ability to stretch and sit down as needed.  Dr. Matuszak stated she would clear him for that work attempt and do a follow-up to see how Plaintiff was doing. Dr. Matuszak noted that Mr.Sherman was walking with a very stiff and guarded gait and a slight limp. (Id).

On June 29, 2006, Plaintiff reported to Dr. Matuszak that he was tolerating working as a bartender for twelve hours per week and would like to attempt twenty-one hours per week. (Tr. 375). On July 27, 2006, Plaintiff  reported that he was working twenty-one hours per week as a bartender but would be unable to go beyond that due to an increase in back pain, which required

5

him to lie down.  Examination showed tenderness in the lumbar spine and slight improvement in range of motion, seated straight leg raising on the left aggravated pulling and radiating pain down the back of his leg, and that Plaintiff was walking stiffly. (Tr. 373-74).

### Comprehensive Pain Management Center

On January 29, 2007, Plaintiff was evaluated at the Comprehensive Pain Management Center (Tr. 414-415).  There it was noted that Plaintiff had been experiencing difficulties with activities of daily living. He was diagnosed as suffering from a pain disorder associated with both

psychological factors and general medical condition; and, mood disorder with anxiety due to pain and was given a GAF of 55 (Tr. 415).[3]

On March 8, 2007 Plaintiff returned to the pain clinic stating that he had benefitted from the techniques he learned in the pain program.  At the time Plaintiff also complained of an increase in his neck pain and spasms in his left leg. (Tr. 399).

On July 19, 2007, Plaintiff reported that he was working part-time. His pain score ranged from 3/10 with medication, and at worst it was 10/10. (Tr. 397).  On October 18, 2007, Plaintiff again returned to the pain management clinic complaining that he was doing worse with his neck and low back (Tr. 441).

---

[3]   The GAF scale is a method of considering psychological, social, and occupational function on a hypothetical continuum of mental health. The GAF scale ranges from 0 to 100, with serious impairment in functioning at a score of 50 or below. Scores between 51 and 60 represent moderate symptoms or a moderate difficulty in social, occupational, or school functioning, whereas scores between 41 and 50 represent serious symptoms or serious impairment in these areas. See Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. 1994).

### Comprehensive Pain Management Center - Dr. Nathan Hill, M.D. - Treating Primary Care Physician

During July, 2007, Dr. Hill discontinued treating Plaintiff with Percocet and prescribed Oxycontin 20 mg twice a day (Tr. 442).

On November 15, 2007,  x-rays of Plaintiff's cervical and lumbar spine were taken.  The x-ray of the cervical spine did not reveal evidence of significant degenerative changes. The x-ray of the lumbar spine revealed post-operative changes. (Tr. 427).

### Dr. Alan White, Ph.D. Psychological Evaluation

On January 15, 2008, Plaintiff was referred by the Bureau of Disability Determination for a psychological evaluation performed by Alan White, Ph.D. (Tr. 475-481).  Plaintiff reported to Dr. White that he was unable to work due to physical reasons. He did not complain of depressive or anxiety symptoms. (Tr. 478).

Dr. White noted that Plaintiff appeared to be borderline range of intellectual functioning (Id).  Dr. White did not provide a diagnosis of Plaintiff after evaluation (Id).  Dr. White only found a mild limitation in Plaintiff's ability to maintain attention, concentration, persistence and pace to perform routine tasks. (Tr. 481).

### Dr. Esberdado Villanueva, M.D. - Record Review for Physical RFC

On March 1, 2008, Dr. Villanueva reviewed Mr. Sherman's record and completed a physical residual functional capacity evaluation. (Tr. 533-540). Dr. Villanueva opined that Plaintiff was capable of light work activity. (Tr. 534).

### MRI of Spine

On May 1, 2008, an MRI of Plaintiff's cervical spine was done which revealed a small central disc protrusion at C5-6, slightly compressing the dural sac, and at C6-C7 level, a tiny

7

para-central disk protrusion, again slightly compressing the dural sac. The radiologist noted that, compared to the previous examination of January 2, 2007, there was no significant change. (Tr. 561).

### Dr. Ashok Biyani, M.D. - Treating Orthopedic Surgeon

On October 22, 2008, Plaintiff saw Dr. Biyani with complaints of ongoing neck pain and right upper extremity pain. Upon examination, Dr. Biyani found significant spasm and guarding, limitation of motion and a positive spurling side in Mr. Sherman's cervical spine and a 4/5 weakness of the right upper extremity. (Tr. 864).

On November 18, 2008, Dr.Biyani performed a diskectomy and cervical fusion on Mr. Sherman's spine. (Tr. 861-863). At the December 3, 2009, follow-up visit Plaintiff reported to Dr. Biyani mild aching and stiffness in his neck. (Tr. 859). On May 20, 2009, Plaintiff reported to Dr. Biyani that his cervical surgery had helped him quite a bit, but he was still experiencing some back pain. (Tr. 855).

### Dr. Thomas F. Kindl, M.D. - Treating Physician

On June 21, 2009, Plaintiff was referred to Dr. Kindl at Midwest Pain Treatment Center for a consultation (Tr. 852-853). At that time Plaintiff complained of a burning, aching pain in his cervical dorsal junction with left upper extremity weakness. He reported his pain was 11/10 in his lumbar spine with severe left lower extremity dysesthesia and weakness. (Tr. 852). After examination, Dr. Kindl diagnosed Plaintiff with cervical post-laminotomy syndrome, lumbar post-laminotomy syndrome, accelerated opiate use and Tylenol overuse. (Tr. 853).

On July 27, 2009, Plaintiff returned to Dr. Kindl after having MRIs of his cervical and lumbar spine. Dr. Kindl noted that the MRI revealed significant uncovertebral hypertrophy at

8

both ends of his cervical surgical procedure. In the lumbar spine, there was evidence of epidural fibrosis, posterior to the replaced disc at L5-S1. There was also posterior element hypertrophy at the lower lumbar segments. At that time, Plaintiff complained of burning, stabbing pain in the cervical dorsal junction and upper cervical spine. He was also complaining of persistent burning pain in the lumbosacral junction with left lower extremity dysesthesia. (Tr. 850). Dr. Kindl diagnosed a cervical spondylosis and lumbar post-laminectomy syndrome. (Id). On August 20, 2009, Dr. Kindl injected Plaintiff's bilateral C2-3, C3-4 and C4-5 cervical facet joints with preservative-free Marcaine 4.0 ml, 0.125% and Kenalog 1.0 ml,10 mg. (Tr. 849).

### Firelands Regional Medical Center

On August 24, 2009, Plaintiff was admitted to the Firelands Regional Medical Center after attempted suicide by hanging (Tr. 752-759). Upon admission, it was noted that Plaintiff was a serious high risk for suicide. He was diagnosed as suffering from major depression. (Tr. 754). Plaintiff was discharged on August 31, 2009. At that time, he was given a GAF score of 40-50. (Tr. 764).

### University of Toledo Medical College of Ohio

On September 3, 2009, Plaintiff was admitted to the University of Toledo Medical College of Ohio after sustaining a significant crush injury to his foot and leg due to an automobile accident. While hospitalized Plaintiff underwent four surgeries including three excisional debridements as well as a revision and fixation of his foot fractures. Plaintiff was discharged September 14, 2009. (Tr. 760).

### Dr. Nabil Ebraheim, M.D. - Treating Physician

9

On September 29, 2009, Plaintiff underwent a skin grafting and fixation of the navicular fracture by Dr. Ebraheim (Tr. 887).  Plaintiff returned to Dr. Ebraheim for a follow-up on October 5, 2009, at which time it was noted that Plaintiff's wounds were healing (Tr. 882).

On November 12, 2009, the external fixator and manipulation of his foot and ankle were removed. (Tr. 877). On November 23, 2009, it was noted that Plaintiff could be weight bearing as tolerated. (Tr. 873). A January 21, 2010  x-ray of the right foot and ankle showed multiple healing fractures but with residual irregularities along the mid foot (Tr. 872).  On March 31, 2010, Plaintiff reported that he was having pain with weight bearing and painful ambulation. Examination indicated that there was significant pain with lateral or medial deviation of the forefoot. (Tr. 866).

### Dr. Thomas M. Evans, Ph.D. - Examining Psychologist

On June 17, 2010, Dr. Evans performed a psychological evaluation of Plaintiff (Tr. 931-938). After a clinical interview, Dr. Evans opined that Plaintiff met the criteria for a diagnosis of depressive disorder, NOS and cognitive disorder.  Dr. Evans considered Plaintiff to be of sub-average intelligence (Tr. 937).  Dr. Evans noted that Plaintiff walked with the assistance of a cane and was observed to be in a moderate degree of physical distress throughout the entire evaluation. (Tr. 938). Dr. Evans opined that Plaintiff was mildly impaired in his ability to understand and follow simple repetitive directions and in his ability to withstand stress and pressure. (Id).

### C.  Hearing Testimony

10

### 1.  Plaintiff's Testimony: Initial Hearing

At the hearing Plaintiff testified that subsequent to  his first lumbar surgery in 2005, his condition and pain improved for approximately four or five months but then began to get worse. He stated that he began to experience pain radiating down his left leg and then into his left arm (Tr. 59-60).  Since the 2005 surgery Plaintiff has been using narcotic analgesic medication. (Tr. 60).  Plaintiff stated that after his cervical surgery his neck motion improved for about six months but thereafter returned to being stiff and hurting. (Id).

Plaintiff stated that he can stand for half hour to an hour at a time and sit for a couple of minutes, depending on the angle and placement of his tail bone. He stated that when he is home, his most comfortable position is when he is lying halfway on the couch, leaning upon a pillow. He stated that he spends a couple of hours a day in that position.  Additionally, when he awakens in the morning, he typically has to lie down after about an hour (Tr. 61).

He stated that during a typical eight hour period,  he can be up for three to four hours but he will then feel sharp pains, and his leg gets numb, and when this happens, he has to lie down. (Tr. 62).  Plaintiff opined that, even if he were to work a desk job where he could stand or sit as needed, he would be unable to work a full eight hour day and that he would experience pain and be uncomfortable while working, and that this pain would disrupt or interfere with his ability to think (Tr. 62).

Plaintiff stated that he spends much of his day walking around, reading books and playing with his daughter. He stated that he can read a book for approximately  twenty minutes at a time but then begins to experience stiffness and pain in the middle of his neck. At night, he can only

sleep two to three hours at a stretch before he wakes up due to pain. (Tr. 63).

### 2.  Plaintiff's Testimony: Supplemental Hearing

At the October 27, 2010 supplemental hearing Plaintiff testified that he has limited motion in his neck, that he has pain when he moves his head up and down and that it hurts to shave (Tr. 39).  Plaintiff speculated that, if he had a job where he had to sit and look down at something, he would be able to do that for only approximately one third of the work day (Tr. 40).

### 3.  Expert Testimony

### Dr. Paul Gatens, M.D. - Medical Expert (Initial Hearing)

Dr. Paul Gatens, M.D. testified as a medical expert at the hearing held on May 20, 2010 (Tr.64).  Dr. Gatens stated that Plaintiff's major impairment was cervical disc disease and cervical degenerative joint disease, lumbar disc disease and lumbar degenerative joint disease (Tr. 64-65).

Dr. Gatens opined that Plaintiff's impairments did not meet the requirements of a listing. (Tr. 65). The ALJ asked Dr. Gatens for an opinion regarding Plaintiff's limitations for the period July, 2005 through the end of March 2009. (Tr. 66).  Dr. Gatens stated that Plaintiff was capable of lifting 20 pounds occasionally and 10 pounds frequently; standing and walking five hours but must change positions every 30-45 minutes; he could occasionally crawl, crouch, kneel or stoop; but could not work around ropes, ladders or scaffolding; nor do commercial driving due to decrease of range of motion in the neck; and, due to the use of Vicodin, no hazardous equipment. (Tr. 67).

Upon cross-examination by Plaintiff's counsel,  Dr. Gatens testified that epidural fibrosis and scarring can lead to arachnoiditis. (Tr. 68).  Regarding Plaintiff's need to change position

12

every 30-45 minutes, Dr. Gatens testified that, while pain can be a part of it, it is more because of the stiffness. (Tr. 70). Dr. Gatens also testified that Plaintiff's medical file supports Plaintiff's self reporting testimony that he had been taking narcotic medications and that narcotic medication is prescribed for severe pain. (Tr. 71).  Dr. Gatens also noted that Plaintiff  "certainly would have pain." When questioned about Plaintiff's need to  lie down to relieve his pain, Dr. Gatens testified that it was a personal preference and that, occasionally, some people require lying down. (Id).  Additionally, Dr. Gatens noted that, while not common, it was not unreasonable that Plaintiff would need  to lie down every three hours (Tr.72).

### Dr. Richard P. Astrike - Vocational Expert (Initial Hearing)

Dr. Richard P. Astrike, a vocational expert, also testified at the hearing. (Tr. 72). Dr. Astrike  testified that Plaintiff had a work history that included painter, concrete finisher, construction labor, janitor, housekeeper, machine operator and factory laborer. (Tr. 72-73).  He also stated, regarding Dr. Gatens's opinions of Plaintiff's physical limitations, that Plaintiff was capable of performing light work as a housekeeper. (Tr. 73).

### Carl Hartung - Vocational Expert (Supplemental Hearing)

Carl Hartung, a vocational expert, testified at the supplemental hearing on October 22, 2010 (Tr. 26). Regarding Plaintiff's work history, Mr. Hartung testified Plaintiff had worked as a bartender, housekeeping/cleaner, machine operator, construction worker and concrete finisher. (Tr. 29).

The ALJ asked a hypothetical question describing a thirty-five year old with a marginal education and limited to lifting 20 pounds occasionally, 10 pounds frequently; able to sit for one hour at a time for a total of six hours; stand or walk for 30-45 minutes at a time for

less than five hours; with no climbing; occasional crouching; no driving; occasional crawling, stooping, kneeling; no work around hazardous moving machinery; limited to receiving verbal instruction only; and, limited to work involving simple instruction and simple tasks.  VE Hartung responded by stating that such an individual would be unable to perform Mr. Sherman's past relevant work. (Tr. 30).

Mr. Hartung also testified that the hypothetical question limited the individual to about ten percent of the sedentary, unskilled work base.(Tr. 31), and he identified jobs such as electronics assembler, assembler of small products, sorter, and filling machine operator. (Tr. 32).

Counsel for Plaintiff asked the VE to consider an additional limitation that the hypothetical individual would only occasionally be able to rotate, flex and extend his neck. (Tr. 34), and the VE responded that, while such an individual could still do those jobs, he would be unable to sustain it for meeting productivity standards. (Tr. 36).

The ALJ then asked if the limitation was frequent extending, flexing and rotating of the neck, and VE Hartung testified that he did not think the limitation would effect the jobs identified. (Id)  Plaintiff's counsel then asked the VE to refer back to the ALJ's original hypothetical question and add the limitation that the individual would have to lie down every three hours for about half hour at a time. (Tr. 37)  The VE responded that an employer would not allow the described individual in the work-place. (Tr. 38).

## IV. Analytical Overview: Determining Disability

DIB and SSI are properly awarded only to applicants who are determined to suffer from a "disability."  Colvin, supra, 475 F.3d 727, 730 (6th Cir. 2007), (citing, 42 U.S.C. § 423(a), (d)).

"Disability" is defined as the "inability to engage in any substantial gainful activity by

reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  Colvin, supra,  (475 F.3d at 729), citing, 42 U.S.C. § 423(d)(1)(A) (definition used in the DIB context); See also 20 C.F.R. § 416.905(a) (same definition used in the SSI context)).

In determining disability under 42 C.F.R..§§ 404.1520 and 416.920, the ALJ must undertake a five step sequential analysis:

> **Step 1**: Determine whether the applicant is engaged in "substantial gainful activity" at the time benefits are being sought.  If yes, the applicant is not disabled. If no, then move to step 2.[4]
> **Step 2**: Determine whether the applicant suffers from any impairment which, either by itself or in combination with one or several other impairment, is "severe."  If there is no finding of a "severe" impairment, then there is no disability.  If there is a determination that the applicant suffers a "severe" impairment, move to step 3.[5]
> **Step 3**: Determine whether any previously identified severe impairment meets or equals a listing in the Listing of Impairments.  If yes, then the applicant is disabled.  If no, proceed to step 4.[6]
> **Step 4**: Determine if the applicant retains sufficient "residual functional

---

[4]  Substantial gainful activity is defined as work activity that is both substantial and gainful. "Substantial work activity" is work activity that involves doing significant physical or mental activities.  20 C.F.R § 404.1572(a) and 20 C.F.R § 416.972(b). "Gainful work activity" is work that is usually done for pay or profit, whether or not profit is realized.  20 C.F.R § 404.1572(b) and 20 C.F.R § 416.972(b).  If an individual engages in substantial gainful activity that person is determined not to be disabled, regardless of the severity of any otherwise identified impairments, mental or physical.

[5]  Under the regulations, an impairment or combination of impairments is "severe"if it significantly limits the individual's ability to perform basic work activities. Impairments are "not severe" where medical and other evidence establish only slight abnormalities, individually or in combination, that have no more than a minimal, adverse effect on the individual's ability to work. 20 C.F.R § 404.1521 and 20 C.F.R § 416.921.

[6]  The previously identified severe impairment or combination of impairments must meet or medically equal an impairment listed in 20 C.F.R Part 404, Subpart P, Appendix 1.  20 C.F.R §§  404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and  416.926.

capacity"[7] to allow for the performance of his past, relevant work .  If  the applicant possesses sufficient residual functional capacity to perform his past relevant work, then there is no disability.  If not, move to step 5. [8]

**Step 5**: Determine if there are jobs in the current economy that applicant could perform, given the limits of her residual functional capacity and consistent with the applicant's other relevant characteristics.  If there are such jobs, then the applicant is not disabled.  If there are no such jobs, then the applicant is disabled. [9]

See Heckler v. Campbell, 461 U.S. 458, 460, 76 L. Ed. 2d 66, 103 S. Ct. 1952 (1983), see also

Combs v. Comm'r of Soc. Sec., 400 F.3d 353 (6th Cir. 2005),  Jones v. Comm'r of Soc. Sec., 336

F.3d 469, 474 (6th Cir. 2003);  Preslar v. Sec'y of Health & Human Servs., 14 F.3d 1107, 1110

(6th Cir. 1994).  20 C.F.R. § 404.1520 (1982);.);  Tyra v. Secretary of Health and Human

Services, 896 F.2d 1024, 1028-29 (6th Cir. 1990),.  Moon v. Sullivan, 923 F.2d 1175, 1181 (6th

Cir. 1990).

## V. The ALJ's Findings

---

[7]  A determination of the applicant's residual functional capacity must be done before the determination of whether applicant can perform past relevant work. .  20 C.F.R § 404.1520(e) and 20 C.F.R § 416.920(e).  An applicant's residual functional capacity is the ability to perform physical or mental work activities on a sustained basis even though the applicant may suffer limitations from his impairments. In making a residual functional capacity determination all the applicant's impairments, including those impairments that are not severe, must be considered.  20 C.F.R § 404.1520(e), 20 C.F.R §§ 416.920(e) and 416.945.

[8]  Past relevant work means work performed either as the applicant actually performed it or as it is generally performed in the national economy either within the past 15 years or 15 years prior to the date the disability must be established. Additionally the work must have lasted long enough for the applicant to have learned the job and for it to have become substantial gainful activity for him.  20 C.F.R §§ 404.1560(b) 404.1565 and 20 C.F.R §§ 416.960(b) and 945.965.

[9]  The determination of whether the applicant can do any work at all must take into consideration the applicants residual functional capacity along with the applicant's age, education and work experience.  At this stage the burden is upon the Commissioner to show that work exists in significant numbers within the economy that the applicant can do, given the applicant's limiting characteristics.  20 C.F.R §§ 404.1512(g) 404.1560(c) and 20 C.F.R §§ 416.912(g) and 945.960(c)    .

The ALJ made the following findings:

**1**.  The claimant last met the insured status requirements of the Social Security Act on March 31, 2009.

**2**.  The claimant did not engage in substantial gainful activity during the period from his amended alleged onset date of July 1, 2005 through his date last insured of March 31, 2009 (20 C.F.R. § 404.1571, et seq.).

**3**.  Through the date last insured, the claimant had the following severe impairments: cervical disk disease and cervical degenerative joint disease status post cervical diskectomy and fusion at C5-C7 surgery in November 2008; lumbar disk disease and lumbar degenerative joint disease status post lumbar fusion surgery in July 2005; alcohol abuse and depression (20 C.F.R. § 404.1502(c)).

**4**.  Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525 and 404.1526).

**5**.  The claimant had the residual functional capacity to perform less than the full-range of sedentary wor4k as defined in 20 C.F.R. § 404.1567(a) with the following abilities and limitations: (1) able to lift and carry 20 pounds occasionally and 10 pounds frequently; (2) able to sit 1 hour at a time for a total of 6 hours in an 8 hour workday; (3) able to stand and/or walk for 30-45 minutes at a time for a total of 5 hours in an 8 hour workday; (4) precluded from climbing and high work; (5) able to occasionally crawl, stoop, kneel and crouch; (6) precluded from driving in the work place and working around hazardous moving machinery; (7) limited to receiving verbal instructions only and (8) limited to work involving simple instruction and simple tasks.

**6**.  Through the date last insured, the claimant was unable to perform any past relevant work (20 C.F.R. § 404.1565).

**7**.  The claimant was born on August 17, 1975 and was 33 years old, which is defined as a younger individual age 18-44, on the date last insured (20 C.F.R. § 404.1563).

**8**.  The claimant has a marginal education and is able to communicate in English (20 C.F.R. § 404.1564).

**9**.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and C.F.R. Part 404, Subpart P, Appendix 2).

**10**.  Through the date last insured, considering the claimant's age, education, work experience and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 C.F.R. §§ 404.1569 and 404.1569(a).

**11**.  The claimant was not under a disability, as defined in the Social Security Act, at any time from July 1, 2005, the amended alleged onset date, through March 31, 2009, the date last insured (20 C.F.R. § 404.1520(g)).

## VI. Standard of Review

District Court review of Commissioner of Social Security disability determinations is limited to evaluating whether the decision made by the Commissioner is supported by "substantial evidence" and consistent with applicable, legal standards. Colvin v. Barnhart , supra, 475 F.3d 727, 729 (6th Cir. 2007). The district court shall affirm the Commissioner's conclusions unless the Commissioner failed to apply the correct legal standard or made findings of fact that are unsupported by substantial evidence. McClanahan v. Comm'r of Soc., 474 F.3d 830 at 833 (citing Branham v. Gardner, 383 F.2d 614, 626-627 (6th Cir. 1967)). The Commissioner's findings as to any fact shall be conclusive if supported by substantial evidence. Id. (citing 42 U.S.C. § 405(g )).

"Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Id. (citing Besaw v. Secretary of Health and Human Services, 966 F.2d 1028, 1030 (6th Cir. 1992)). See also Cutlip v. Sec'y of Health & Human Servs, 25 F.3d 284, 286 (6th Cir. 1994).

"The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion. . . . This is so because there is a 'zone of choice' within which the Commissioner can act, without the fear of court interference." Buxton v. Halter, 246 F.3d 762, 772 (6th Cir. 2001) (citations omitted)).

Moreover, because district court review of the Commissioner's decision is, essentially, appellate in character, the court is not to undertake de novo review, and is restrained from attempting to resolve evidentiary conflicts as well as from making credibility determinations. Cutlip, supra 25 F.3d 284, 286 (citing Brainard v. Secretary of Health and Human Services, 889

F. 2d 679, 681 (6th Cir. 1989); <u>Garner v. Heckler</u>, 745 F. 2d 383, 387 (6th Cir. 1984)).   Rather, the reviewing court is bound to affirm the Commissioner's decision, provided that such decision is supported by substantial evidence, even if the court were inclined to have decided the case differently.  <u>Her v. Comm'r of Soc. Sec.</u>, 203 F.3d 388, 389-90 (6th Cir. 1999).  Where supported by substantial evidence, the Commissioner's findings must be affirmed, even if there is evidence favoring plaintiff's side.  <u>Listenbee v. Sec'y of Health & Human Servs.</u>, 846 F.2d 345, 349 (6th Cir. 1988).  The decision by the administrative law judge is not subject to reversal even where substantial evidence could have supported an opposite conclusion.  <u>Smith v. Chater</u>, 99 F.3d 780, 781-82 (6th Cir. 1996).

## VII.  Issues Before the Court

Plaintiff sets forth the following issues and/or claims of error in this case:

**Issue No. 1.**   Whether the Commissioner's Decision Is Supported By Substantial Evidence When the Procedural Requirements for Evaluating the Opinion of Plaintiff's Treating Physician Were Not Followed.

**Issue No. 2.**   Whether the Commissioner's Decision Is Supported By Substantial Evidence When Plaintiff's Limitations Were Not Fully and Fairly Evaluated.

## VIII.  Discussion

### Issue No.1.    Did the ALJ Correctly Apply the Treating Physician Rule?

Issue No. 1 asks the question of whether the ALJ correctly assessed Plaintiff's medical condition and RFC in light of the evidence on the record, including the opinions and observations  of the various health care providers who examined, evaluated or treated Plaintiff and, in that light, whether the ALJ correctly applied the treating physician rule to the opinions provided by  Plaintiff's treating physicians.

### A.  The Treating Physician Rule

19

The treating physician rule imposes requirements on the manner in which the Commissioner both considers and gives expression to the opinions of a claimant's treating physician.  First, the Commissioner shall accord treating physician opinions appropriate deference consistent with the record evidence, and, second, the decisions and determinations that the Commissioner issues  must articulate, with appropriate specificity, the Commissioner's reasons for his handling of  treating physician opinions.

### i.  Treating Physician Opinion Accorded Deference

20 C.F.R. § 404.1527(d)(2) provides in pertinent part,

> If we find that a treating source's opinions on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically accepted clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

Where appropriate conditions are met, a treating physician's opinions are accorded "substantial, if not controlling deference."  Vance v. SSA, 260 F. App'x 801, 804 (6th Cir. 2008), Warner v. SSA, 375 F.3d 387, 390 (6th Cir. 2004).  The most emphatic application of this rule is that where a treating physician's opinion is uncontradicted such opinion is entitled to complete deference. Howard v. SSA, 276 F.3d 235, 240 (6th Cir. 2002), Harris v. Heckler, 756 F.2d 431, 435 (6th Cir. 1985).

Where evidence does not warrant a treating physician's opinions being given controlling weight, treating physician opinions must nonetheless be evaluated in accordance with the criteria set forth in 20 C.F.R. § 404.1527(d)(2)(i) and (ii), which list such factors as duration of physician patient treatment relationship, number and frequency of examinations, nature and extent of the treatment relationship, and others.

20

Notwithstanding the deference generally accorded treating physician opinions, the Sixth Circuit has consistently stated that "[the Commissioner] is not bound by the treating physician's opinions, and that such opinions receive great weight only if they are supported by sufficient clinical findings and are consistent with the evidence." Bogle v. Sullivan, 998 F.2d 342, 347-48 (6th Cir. 1993).

The appropriate question is whether the treating physician's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record." Rogers v. Commissioner of Social Security, 486 F.3d 234, 242 (6th Cir. 2007). (citation omitted).

It is also true, however, that a treating physician's opinions may be deficient. See, Vance, supra, 260 F. App'x 801, 805 (physician's area of treatment differs from the medical issue about which physician opined); Gaskin v. Comm'r of Soc. Sec., 280 F. App'x 472, 474-75 (6th Cir. 2008) (physician's opinion conflicts with his treatment notes); Hamblin v. Apfel, 7 F. App'x 449, 451 (6th Cir. 2001) (treating physician's opinion was five years old).

Also, treating physician opinions are limited.  Thus, a treating physician's opinions on issues such as whether the claimant is disabled or claimant's residual functional capacity, "are not medical opinions . . . but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case, i.e., that would direct the determination or decision of disability." 20 C.F.R. § 416.927(e); accord Warner v. Commissioner of Social Security, 375 F.3d 387, 390 (6th Cir. 2004) ("The determination of disability is ultimately the prerogative of the Commissioner, not the treating physician.") (citation and brackets omitted).  As an interpretive rule "[g]enerally, the more consistent an opinion is with the

21

record as a whole, the more weight [the ALJ] will give to that opinion." 20 C.F.R. §

416.927(d)(4).

### ii.  Decisions must articulate, with specificity, rationale for weight accorded Treating Physician Opinions

Where a treating physician opinion is not given controlling weight the Commissioner

shall "give good reasons in [the] notice of determination or decision for the weight" accorded to

such opinion.  20 C.F.R. § 404.1527(d)(2).  See, Wilson v. Comm'r of Social Security, 378 F.3d

541, 544 (6th Cir. 2004).

In his decisions  the Commissioner must articulate his reasons for the weight given an

applicant's treating source's opinions.  Id.  When denying benefits the Commissioners decisions

shall

> contain specific reasons for the weight given to the treating source's medical
> opinion, supported by the evidence in the case record, and must be sufficiently
> specific to make clear to any subsequent reviewers the weight the adjudicator
> gave to the treating source's medical opinion and the reasons for that weight.

Id., citing. Social Security Ruling 96-2p, 1996 SSR LEXIS 9 at *12, 1996 WL 374188, at *5.

See, also, Rogers v. Commissioner of Social Security, supra,  486 F.3d at 242.

The Wilson Court explained the two-fold purpose behind this procedural requirement:

> The requirement of reason-giving exists, in part, to let claimants understand the
> disposition of their cases," particularly in situations where a claimant knows that
> his physician has deemed him disabled and therefore "might be especially
> bewildered when told by an administrative bureaucracy that she is not, unless
> some reason for the agency's decision is supplied." Snell v. Apfel, 177 F.3d 128,
> 134 (2d Cir. 1999). The requirement also ensures that the ALJ applies the treating
> physician rule and permits meaningful review of the ALJ's application of the rule.

Wilson, 378 F.3d at 544.

Because the reason-giving requirement exists to "ensur[e] that each denied claimant

receives fair process," the Sixth Circuit has held that an ALJ's "failure to follow the procedural requirement of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight given "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record."  Rogers, supra, 486 F.3d 234, 243.  See also Blakley v. Comm'r of Soc. Sec., 581 F.3d 399 (6th Cir. 2009) (Sixth Circuit reversed decision of District Court upholding ALJ decision of nondisability and remanded to the Commissioner).

### B.  Treating Physician Opinion, Plaintiff's Medical Condition and RFC

Plaintiff asserts that the ALJ is required to consider all of the medical opinions in a claimant's record..  See 20 C.F.R. § 404.1527(b).  Plaintiff also notes that where the treating physician's opinion is not given controlling weight the ALJ is required to articulate with specificity the factors that support the ALJ's decision to depart from the opinion of the claimant's treating physician.  20 C.F.R. § 404.1427(d)(2).  See Wilson and Rogers, supra. (Docket No. 16, p. 11-12).  The gist of Plaintiff's argument that the ALJ violated the treating physician rule is that the ALJ failed "to adequately explain the weight given to the opinion of Mr. Sherman's treating physician, Dr. Matuszak."  (Docket No. 16, p. 13).  Plaintiff asserts that the ALJ's discounting of the opinions of Dr. Matuszak lacks sufficient specificity to meet the second prong of the treating physician rule and, on this basis, the ALJ's opinion, that Plaintiff is not disabled, is not supported by substantial evidence (Docket No. 16, p. 13-14).

Defendant argues that the ALJ did not violate the treating physician rule and, in this light, identifies a variety of evidentiary factors contained in the record upon which basis the ALJ discounted or could have discounted the opinion of treating physician Dr. Matuszak.  (Docket

No. 17, p. 5-8).

Accordingly, the issue before this Court is, essentially, to determine if, in departing from the opinion of Plaintiff's treating physician, Dr. Matuszak, the ALJ articulated, with adequate specificity, his rationale for so deciding.

A summary of Dr. Matuszak's findings and opinions regarding Plaintiff are that Dr. Matuszak treated Plaintiff following his lumbar surgery in July 2005; her examinations of Plaintiff consistently found reduced range of motion in his lumbar spine, tenderness and spasm; and a subsequent MRI of Plaintiff's lumbar spine was noted to have epidural fibrosis and scarring.(Tr. 378).  Dr. Matuszak opined that Plaintiff suffered from a failed back syndrome (Tr. 384).  On November 16, 2006, Dr. Matuszak reported that Plaintiff was released to work with restrictions and she further opined that Plaintiff could not lift or carry anything over five pounds, he must be allowed to change positions as needed and would be limited to twenty-one hours per week. (Tr. 356).  (Docket No. 16, p. 13).

As Plaintiff correctly notes in his Brief on the Merits "the ALJ does not even refer to Dr. Matuszak by name" in the January 3, 2011 Decision (Docket No. 16, p. 13).  However, the Court views the fact that the ALJ did not specifically mention Dr. Matuszak as only suggestive, but not dispositive, of the issue addressed herein.  What is important, however, is whether the ALJ sets forth reasons that would explain why he discounted the various opinions of Dr. Matuszak, as set forth above.

In the narrative portions of his Hearing Decision of January 3, 2011, ALJ John Shailer describes the following regarding Plaintiff's medical condition:

●ME Dr. Paul Gatens, M.D. testified at the initial hearing that Plaintiff had the following impairments prior to the date of the last insured: cervical disk disease (Tr. 11);  ●cervical

24

degenerative joint disease status post cervical diskectomy and fusion C5-C7 surgery in November, 2008 (Tr. 11);  ●lumbar disk disease (Tr. 11);  ●lumbar degenerative joint disease status post lumbar fusion surgery in July, 2005 (Tr. 11).

●The ALJ stated that he had considered all symptoms and the extent to which those symptoms could reasonably be accepted as consistent with the objective medical and other evidence. (Tr. 13). ● The ALJ determined that Plaintiff had sought treatment for complaints similar to those he alleged at the hearing. (Tr. 14).

●Plaintiff was diagnosed with and/or treated for cervical disk disease, cervical degenerative joint disease, lumbar disk disease and lumbar degenerative joint disease (Tr. 14);  ●Plaintiff underwent lumbar fusion surgery in July, 2005 and cervical diskectomy and fusion at C5-C7 surgery in November, 2008. (Tr. 14); ●Plaintiff underwent physical therapy and participated in a pain management program (Tr. 14).

●The ALJ stated that all of the following evidence supported Plaintiff's alleged symptoms (TR. 14):  ●The results of a January, 2007 MRI of the cervical spine, ●November, 2007, x-rays of the cervical spine, ●a May, 2008 MRI of the cervical spine, ●November, 2008 x-rays of the cervical spine, ●December, 2008 x-rays of the cervical spine, ●January 2009 x-rays of the cervical spine, ●July, 2009 MRI of the cervical spine; and ●the results of a February, 2005 EMG, and March 2005 x-rays of the lumbar-sacral spine, ●an April, 2006, MRI of the lumbar spine, ●November, 2007 x-rays of the lumbar spine, ●a July, 2009 MRI of the lumbar spine; ●treating and examining physician occasional findings that Plaintiff had decreased range of motion and tenderness to palpation in his neck and back,  positive straight leg raising tests and a stiff gait. (Tr. 14).

●However, the ALJ found the following not credible: ●Plaintiff's statements concerning intensity, persistence and limiting effects of his symptoms to the extent they are inconsistent with the RFC assessment.  (Tr. 14);  ●Dr. Gatens testimony as ME at the initial hearing that Plaintiff's physical abilities and limitations were consistent with the ALJ's RFC assessment. (Tr. 14); ●Plaintiff was noted to have normal range of motion and strength in his neck and/or upper extremities in October, 2006 and July, 2007 (Tr. 14); ●Plaintiff reported that his neck was "doing much better" in December, 2008 (Tr. 14); ●Plaintiff reported that his neck was "markedly improved" in January, 2009 (Tr. 14); ●Plaintiff reported that his neck was still "a lot better and overall is doing well" in May, 2009 (Tr. 14);  ●November, 2007, x-rays of Plaintiff's cervical spine were interpreted as being "within normal limits" (Tr. 14);  ●In May, 2009 x-rays and in July, 2009 an MRI of the cervical spine were interpreted as evidencing stable post-surgical changes and as otherwise unremarkable (Tr. 14); ●Plaintiff was able to perform part-time (21 hours per week) work as a waiter/bartender from at least July, 2006 (Tr. 15); ●Plaintiff rode his motorcycle in September, 2009 (Tr. 15); ●Plaintiff was often noted to have normal strength and range of motion in his back and lower and upper extremities as well as normal gait (Tr. 15); ●Plaintiff was able to walk 8 minutes and 26 seconds for an August, 2007 stress test and stopped not because of back pain but because of leg fatigue and shortness of breath (Tr. 15); ●Plaintiff self reported in October, 2007 that his pain medications were controlling his pain (Tr. 15); ●Plaintiff testified that he continued to perform such activities as changing spark plugs on motorcycles and assisting friends in the maintenance of motorcycles. (Tr. 15); ●Plaintiff testified that he was able to sit on the floor and play with his daughter and that he had recently attended a wedding. (Tr. 15).

25

●The ALJ stated that he had considered the treating physician's assessments of records as well as the state agency medical consultant's physical assessments, but had granted them little weight as they were either more or less limiting than can be considered supported by or consistent with the record. (Tr. 15).

The above reiterates the medical and other evidence upon which the ALJ recounted in support of his finding.

Clearly, the ALJ undertook a detailed review of the record and provided a detailed accounting of the evidence upon which he relied and his reasons for so doing, in reaching his decision concerning Plaintiff's medical condition.  The question for this Court is whether a reasonable person reviewing the ALJ's Decision would find that it contains sufficient, specific reasons, supported by the evidence contained in the case record, for the weight given by the ALJ to Dr. Matuszak's opinions as well as the ALJ's rationale for departing from Dr. Matuszak's opinions. See Wilson v. Comm'r of Social Security, supra 378 F.3d at 544.

Reviewing the whole of the ALJ's Decision, especially the narrative explanation the ALJ provided at pages 14 and 15 of that Decision, this Court finds that the ALJ provided sufficient specificity for his having departed from the opinion of Dr. Matuszak.  Arguably, the ALJ could have been more specific in his Decision.   He could have expressly identified each of Dr. Matuszak's opinions and specifically delineated his reasons for rejecting those opinions.  That he did not render his Decision with such a high degree of specificity does not mean, however, that he failed to satisfy the central requirements of 20 C.F.R. § 1527(d)(2) and  Wilson, supra.

This being so, this Court find that the ALJ provided adequate explanation for departing from the opinions of Dr. Matuszak, that there was substantial evidence for such departure and, therefore, that the procedural requirements for evaluating the opinions of treating physician Dr. Matuszak were satisfied and that there was, on this basis, substantial evidence to support a

finding that Plaintiff was not disabled.

**Issue No. 2. Were Plaintiff's Limitations Fully and Fairly Evaluated**

Plaintiff argues that in formulating his Residual Functional Capacity assessment of Plaintiff the ALJ failed to take into account all of the limitations reasonably resulting from Plaintiff's severe impairments, specifically Plaintiff's severe impairments arising out of his cervical disk disease, degenerative joint disease and status post cervical diskectomy and fusion of C5-C7 surgery of November, 2008 (Docket No. 16, p. 13-15).

Defendant asserts that the ALJ reasonably and properly accounted for Plaintiff's medical condition, including Plaintiff's severe impairments as well as assigning appropriate credibility to Plaintiff's subjective complaints of pain (Docket No. 17, p. 8).

The ALJ's RFC determination is supported by the opinion of ME Dr. Gatens as well as the whole of the record, including taking into consideration the full extent of Plaintiff's cervical and lumbar back problems (Tr. 14, 15). Moreover Dr. Gatens, who reviewed the whole of Plaintiff's medical record, acknowledged Plaintiff's various back problems, but opined that such conditions would not prevent Plaintiff from performing a restricted range of sedentary work (Tr. 14, 65-67).

Plaintiff also argues that the ALJ did not incorporate or acknowledge the VE's response to Plaintiff's attorney's supplemental hypothetical that included a reference to a person as described in the ALJ's hypothetical but who, in addition, needed to lie down every three hours (Tr. 72, Docket No. 16, p. 15). However, the addition of this condition - i.e., needing to lie down every three hours - was not a part of the ALJ's RFC assessment. Neither did ME Gatens opine that Plaintiff's condition called for this requirement. "It is well established that an ALJ . . .

27

is required to incorporate only those limitations accepted as credible by the finder of fact."  Casey v. Sec'y of Heath & Human Servs., 987 F.2d 1230, 1235 (6th Cir. 1993).  The mere fact that Plaintiff's counsel posed a supplemental hypothetical does not obligate the ALJ to add the condition described in that hypothetical to the RFC assessment.  As Dr. Gatens observed, it was not "unreasonable" that Plaintiff would indicate that he needed to lie down every three hours, but he did not require that limitation.  (Tr. 66-68, 71-72).  The ALJ's RFC was not inconsistent with the medical record in this case.  Therefore, contrary to Plaintiff's argument, there is substantial evidence in the record to support the ALJ's determination of Plaintiff's limitations and the ALJ's RFC assessment, and thus there is substantial evidence in the record to support the decision that Plaintiff is not disabled.

## IX.  Conclusion

For these reasons, the Magistrate recommends that the Court Affirm the Commissioner's decision.

s/ Vernelis K. Armstrong
United States Magistrate Judge

Date:   May 4, 2012

## X.  Notice

Please take notice that as of this date the Magistrate's report and recommendation attached hereto has been filed.  Pursuant to Rule 72.3(b) of the local rules for northern district of Ohio, any party may object to this report and recommendations within fourteen (14) days after being served with a copy thereof.  Failure to file a timely objection within the fourteen-day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure.  The objecting party shall file the written objections with the Clerk of Court, and serve

on the Magistrate Judge and all parties, which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections.  Any party may respond to another party's objections within fourteen days after being served with a copy thereof.

Please note that the Sixth Circuit Court of Appeals determined in United States v. Walters, 638 F.2d 947 (6th Cir. 1981) that failure to file a timely objection to a Magistrate's report and recommendation foreclosed appeal to the court of appeals.  In Thomas v. Arn, 106 S. Ct. 466 (1985), the Supreme Court upheld that authority of the court of appeals to condition the right of appeal on the filing of timely objections to a report and recommendation.